# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SERVICE EMPLOYEES
INTERNATIONAL UNION NATIONAL
INDUSTRY PENSION FUND, *et al.*,

          Plaintiffs,

          v.

HEBREW HOMES HEALTH
NETWORK, INC., *et al.*,

          Defendants.

Case No. 1:17-cv-01215 (TNM)

## MEMORANDUM OPINION

The Service Employees International Union National Industry Pension Fund (the "Fund")

seeks to recover a total of $847,290.62 in required pension contributions that Defendants Hebrew

Homes Health Network, Inc., Aventura Plaza, Inc., Jackson Plaza, Inc., Hebrew Homes Sinai,

Inc., Arch Plaza, Inc., Hebrew Homes South, Inc., and Hebrew Homes of South Beach, Inc.

(collectively, the "Employers") admit that they failed to pay. The Court referred this matter to

Magistrate Judge G. Michael Harvey for full case management, and following discovery, the

parties filed cross-motions for summary judgment. Upon consideration of the Magistrate

Judge's Report and Recommendation (the "Report"), R. & R., ECF No. 50, the Court adopts the

Report in full, over the Employers' objections. The Court will deny the Employers' Motion for

Summary Judgment and grant in part and deny in part the Fund's Cross-Motion for Summary

Judgment.

The Employers objected to the Report. *See* Objs. to R. & R., ECF No. 52. The Court

reviews *de novo* any part of the Magistrate Judge's disposition a party properly objects to. Fed.

R. Civ. P. 72(b)(3). The Employers mainly object to the Magistrate Judge's finding that

Amendment Three is a contractual limitations period.[1] The Employers' reasoning is far from clear. They insist that the Court should consider Amendment Three "to be an adoption of . . . the Florida five-year statute of limitations." Objs. to R. & R. at 19–20. Fine. But in that case, the Employers still lose because, as the Report persuasively explains, the Fund's Complaint was timely under Florida's statute of limitations.

The Employers' real gripe is that, according to them, Amendment Three was an unfair, unilateral "cram down." But nowhere in their Objections do the Employers argue that Amendment Three is therefore unenforceable or that they are not bound by its terms. Nor could they. They did not make that argument to the Magistrate Judge, *see* R. & R. at 16, and parties may not present new issues or arguments for the first time in their objections to the Magistrate Judge's Report. *See Sciacca v. FBI*, 23 F. Supp. 3d 17, 27 (D.D.C. 2014); *Aikens v. Shalala*, 956 F. Supp. 14, 19–20 (D.D.C. 1997) (collecting cases).

In any event, the Employers got what they bargained for. In each Employer's negotiated Collective Bargaining Agreement with the Fund, they agreed to be bound by Amendments adopted by the Trustees, like Amendment Three.[2] Indeed, the Employers appear to concede that their obligation to abide by the Trust Amendment is a product of their negotiations with the Fund. *See* Objs. to R. & R. at 24 ("the Plaza Facilities agreed in their CBAs to accept any changes in the Plan"). More, rather than a unilateral "cram down," Amendment Three was adopted by the Fund's Board of Trustees, *see* ECF No. 39-1, which is comprised of equal parts

---

[1] As described more fully in the appended Report, the Employers' sole defense is that the Fund filed its Complaint outside the statute of limitations. Amendment Three is incorporated into the Collective Bargaining Agreements between the Fund and the Employers and establishes the applicable statute of limitations here.

[2] The Collective Bargaining Agreements provide that the Employers "agree[] to be bound by the provisions of the Agreement and Declaration of Trust establishing the Fund, *as it may from time to time be amended*, and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by that agreement, including collection policies, receipt of which is hereby acknowledged." *See, e.g.*, Arch Plaza CBA at 20, ECF No. 36-1 (emphasis added).

representatives from SEIU affiliated labor unions and representatives from participating employers, *see* SOF ¶ 2, ECF No. 36-16. Had they objected to such a process, they should not have entered into the Collective Bargaining Agreements. The Employers have cited no authority that such Amendments passed by the Fund's Trustees are defective. And again, they do not make that argument. Thus, whatever unfairness the Employers perceive, the Court agrees with the Magistrate Judge that Amendment Three is binding on the Employers.

The Employers' other objections are arguments considered and rejected by the Magistrate Judge. The Court has considered the Employers' objections *de novo*. None has merit for the reasons set forth in the Magistrate Judge's thorough and well-reasoned Report. So the Court will adopt in full the Magistrate Judge's Report as its own opinion and append it below.

For these reasons, the Court will deny the Employers' Motion for Summary Judgment and grant in part and deny in part the Fund's Cross-Motion for Summary Judgment. A separate order will issue.

2019.09.12
15:37:07 -04'00'

Dated: September 12, 2019

TREVOR N. McFADDEN
United States District Judge

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SERVICE EMPLOYEES
INTERNATIONAL UNION NATIONAL
INDUSTRY PENSION FUND, *et al*,

       Plaintiffs,

    v.

HEBREW HOMES HEALTH
NETWORK, INC., *et al*,

       Defendants.

Civil Action No.
1:17-cv-1215 (TNM/GMH)

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for full case management. Pending before the Court are the parties' cross-motions for summary judgment. Service Employees International Union National Industry Pension Fund ("the Fund") and its Trustees (collectively "Plaintiffs") filed this action under sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1145, against Hebrew Homes Health Network, Inc. and related corporations ("Defendants"). Plaintiffs seek to recoup from Defendants pension contributions to the Fund which Defendants failed to pay. Specifically, they seek $847,290.62 in delinquent contributions, interest, liquidated damages, fees, and costs, as well as declaratory and injunctive relief. After reviewing the entire record,[1] the undersigned recommends denying Defendants' motion and granting in part and denying in part Plaintiffs' motion.

---

[1] The relevant docket entries for the purposes of this Report and Recommendation are: (1) the third amended complaint (ECF No. 28); (2) Plaintiffs' motion for summary judgment and exhibits (ECF Nos. 36 through 36-18); (3) Defendants' motion for summary judgment and exhibits (ECF Nos. 37 through 37-12); (4) Defendants' notice of filing corrected exhibits (ECF Nos. 38 through 38-3); (5) Plaintiffs' notice of filing of corrected exhibit (ECF Nos. 39 through 39-1); (6) Plaintiffs' memorandum in opposition to Defendants' motion for summary judgment (ECF No. 40); and (7) Defendants' memorandum in opposition to Plaintiffs' motion for summary judgment and exhibits (ECF Nos. 41

# I.    BACKGROUND[2]

## A.    Factual Background

Defendants do not dispute that they underreported and underpaid pension contributions to the Fund between January 2009 and December 2010. Rather, they contend that Plaintiffs' claims to recover those delinquent contributions are untimely. Similarly, Defendants do not dispute the accuracy of Plaintiffs' underpayment and related damages calculations, except to contend that Plaintiffs have applied incorrect employee eligibility criteria for contributions that were due during a three-month period in 2010. The factual background that follows will focus on these disputes.

### 1.    Defendants' Collective Bargaining Agreements with Local 1199

Defendants are a network of six residential nursing and rehabilitation centers located in Miami-Dade County, Florida, and a nonprofit corporation that "provid[es] administration and support" to the centers.[3] ECF No. 37-1 at 2–3. The Fund is a multiemployer pension plan under ERISA that provides pension benefits to eligible employees of contributing employers. ECF No. 36-16 at 1–2; *see also* 29 U.S.C. § 1002(37). The Fund is administered in the District of Columbia

---

through 41-2); (8) Defendants' response to Plaintiffs' statement of material facts (ECF No. 42); (9) Plaintiffs' response to Defendants' statement of material facts (ECF No. 46); (10) Plaintiffs' reply in further support of their motion for summary judgment (ECF No. 47); and (11) Defendants' reply in further support of their motion for summary judgment (ECF No. 48). Citations to page numbers herein reflect the pagination assigned by the Court's Electronic Case Filing system.

[2] The following factual allegations are undisputed (or deemed undisputed) unless otherwise noted. Where a fact from one of the parties' statements of undisputed material facts is explicitly undisputed, the undersigned generally cites the statement of undisputed material facts. In other circumstances, such as when a fact is insufficiently disputed because, for example, either the opposing party's objection fails to cite record evidence or the evidence cited does not support the objection, the undersigned cites the record evidence supporting the fact.

[3] These facilities are: Aventura Plaza, Inc. ("Aventura Plaza"); Jackson Plaza, Inc. ("Jackson Plaza"); Hebrew Home Sinai, Inc. ("Sinai Plaza"); Arch Plaza, Inc. ("Arch Plaza"); Hebrew Homes South, Inc. ("Hebrew Home South Beach"); and Hebrew Homes of South Beach, Inc. ("South Pointe Plaza"). ECF No. 36-16 at 2–3; ECF No. 37-1 at 2–3. Hebrew Home South Beach closed in November 2013, and South Pointe Plaza "was sold to another entity" in April 2018. ECF No. 37-1 at 3.

by a board of trustees made up of equal numbers of labor and management representatives. ECF No. 36-16 at 1–2.

Employees at Defendants' nursing and rehabilitation centers are represented by Service Employees International Union Local 1199 United Healthcare Workers East ("Local 1199"). ECF No. 36-16 at 3. In October 2008, Defendants entered into collective bargaining agreements ("CBAs") with Local 1199 that established the terms and conditions of employment for various covered classifications of employees. ECF No. 36-16 at 3–6; ECF Nos. 36-1 through 36-6. These CBAs were initially effective from the time that Local 1199's members ratified the agreements through September 30, 2010. *Id.*

Under the terms of the CBAs, Defendants agreed to become and remain participating employers in the Fund "throughout the term of th[e] Agreement[s], including any extensions thereof." ECF Nos. 36-1 through 36-6 at ¶ 26.2. Defendants agreed to make contributions on behalf of each covered employee based on the number of hours each employee worked. *Id.* at ¶ 26.3. The CBAs also required each employer to submit a remittance report, including information such as the employees' names and dates and hours of employment, along with its contributions each month. ECF No. 36-16 at 6–7; ECF Nos. 36-1 through 36-5, 36-6 at ¶ 26.3(c); ECF No. 36-15 at 6. As noted above, Defendants do not dispute that between January 1, 2009 and December 31, 2010, they underreported and underpaid their contributions to the Fund.

2.     The Fund's Trust Agreement and Amendment Three

Central to the parties' dispute is whether Plaintiffs' claims are governed by the statute of limitations period contained in the parties' agreement. The CBAs between Defendants and Local 1199 provide that each employer "agrees to be bound by the provisions of the [Trust Agreement], as it may from time to time be amended, and by all resolutions and rules adopted by the Trustees

3

pursuant to the powers delegated to them by that agreement." ECF Nos. 36-1–36-6 at ¶ 26.4. The

Trust Agreement, in turn, explains that the Fund's trustees are empowered "to establish such pro-

cedures, rules and regulations . . . as shall be necessary to carry out the operation of the Plan and

effectuate the purpose thereof." ECF No. 36-7 at 6; ECF No. 36-16 at 7. On November 12, 2013,

the Fund's trustees adopted Amendment Three to the Trust Agreement, which provides:

> In any action by the Trust to collect delinquent contributions from contributing em-
> ployers to the Trust, the limitations period for such action shall be governed by the
> law of the state in which all or the majority of the employees on whose behalf the
> contributing employer makes contributions work, unless such limitations period is
> less than three years, in which case the limitation period under the law of the Dis-
> trict of Columbia shall govern.

ECF No. 39-1 at 17. The District of Columbia has a three-year limitations period for contract

claims. D.C. Code § 12-301(7). The employees covered by the CBAs all worked at facilities in

the State of Florida (ECF No. 36-16 at 2–3; ECF No. 37-1 at 2–3), which has a five-year statute

of limitations applicable to contract claims, Fla. Stat. § 95.11(2)(b).

   3.    Plaintiffs' Discovery of Defendants' Delinquencies

   Plaintiffs filed suit on June 21, 2017, seeking to recoup from Defendants delinquent pen-

sion contributions from January 1, 2009, to December 31, 2010, associated interest, penalties, and

fees. ECF No. 1. Plaintiffs contend that their claims did not accrue until they completed an audit

of Defendants' 2009–2010 payroll records on January 30, 2015. ECF No. 40 at 11. By contrast,

Defendants argue Plaintiffs' claims accrued much earlier when Plaintiffs became aware of infor-

mation that Defendants contend would have led a reasonably prudent pension fund to initiate an

audit that would have revealed the 2009–2010 delinquencies. ECF No. 37-2 at 23–26. Specifi-

cally, Defendants contend that the claims accrued in January 2013, when Plaintiffs filed an action

against Defendants for unpaid contributions to the Fund or, at the latest, in August 2013, when a

whistle-blower informed the Fund that Defendants had underreported their employees' hours. *Id.*

As background for the Court's consideration of these issues, summarized below are the Fund's audit procedures, as well as the circumstances that led to the discovery of the delinquencies at issue.

### a. The Fund's Audit Procedures

Employers participating in the Fund self-report the number of hours worked by covered employees each month and remit contributions consistent with those calculations. ECF No. 36-16 at 13. Because this system relies on data self-reported by participating employers, the Trust Agreement authorizes the Fund to conduct periodic random audits of employers' payroll data to ensure the hours employers have reported are accurate. *Id.* at 13–14; ECF Nos. 36-7 at 5, 36-8 at 6–9. Using a lottery system keyed to the record number the Fund has assigned to each employer, the Fund "endeavors to audit about one third of participating employers every year" so that "every employer is usually audited once every three years or so." ECF No. 36-16 at 14.

Typically, the Fund's audits review two to three years of employer records, comparing the employers' payroll information in tax and unemployment documents with the payroll information the employer remitted to the Fund. ECF No. 36-15 at 13–14. Where an audit reveals an underpayment, the Fund sends the employer a billing letter assessing the amount of the underpayment as well as interest, liquidated damages, and a testing fee that charges the employer for the cost of the audit. *Id.* at 15–16. When an employer fails to pay after receiving a billing letter, the Fund initiates litigation. *Id.*

### b. The Fund's 2009 Employer Audit

In 2009, the Fund randomly selected for a payroll review the employer record number assigned to Defendants, but that number was also assigned to another participating employer based on the Fund's erroneous understanding that the other employer was related to and jointly-operated

by Defendants. ECF No. 36-16 at 16. When the Fund's auditor arrived and learned that the employers were not related or jointly-operated, he audited only the other employer and did not audit Defendants in 2009. *Id.* at 16–17. Plaintiffs then assigned the other employer a new record number so that the issue would not recur. *Id.* at 17.

c.    The Fund's 2013 Lawsuit Against Defendants

In January 2013, Plaintiffs filed suit against Defendants in the U.S. District Court for the Southern District of Florida seeking to recover delinquent contributions that Defendants' monthly remittance reports allegedly had revealed for the years 2008–2012. ECF No. 37-1 at 17; ECF No. 40 at 15–16; *see also Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc.*, Civ. Action No. 13-cv-20175-JEM (S.D. Fl. Jan. 16, 2013). Plaintiffs explain that Defendants accrued the delinquency at issue "by failing to pay the full amount due as stated in [their] own reports submitted during the 2008–2012 period." ECF No. 40 at 16. Plaintiffs suggest that this sort of arrearage differs from amounts due under an audit, which "represent the difference in what was reported to the Fund and what was actually worked by covered employees." *Id.*

The parties settled that case in March 2013, but the Fund reserved the right "to pursue any amounts that the Fund may be entitled to recover as a result of an audit conducted in accordance with the Fund's Trust Agreement and Statement of Policy for the Collection of Delinquent Contributions" for the period of November 2003 through December 2012. ECF No. 37-1 at 18; ECF No. 37-11 at 55.

d.    Michael Alexander's Letter and Meeting with Local 1199

Following the settlement, on August 12, 2013, the Fund received a letter from Michael Alexander, a former administrator for Defendants, alleging that Defendants had "for close to 10

years" underreported covered employees' hours and consequently underpaid Defendants' contributions to the Fund.[4] ECF No. 36-16 at 17; ECF No. 37-1 at 19–20; ECF No. 41 at 18–19. Based on the issues raised in Mr. Alexander's letter, the Fund decided to conduct an audit of Defendants' payroll records from January 1, 2011, through August 2013. ECF No. 36-16 at 17; ECF No. 37-1 at 19; ECF No. 42 at 4. The Fund selected this timeframe because its usual practice is to examine two to three years of employer records during an audit.[5] ECF No. 36-16 at 13, 17. In late August 2013, Local 1199 officials received from Mr. Alexander (1) a copy of Defendant Aventura Plaza's remittance report for June 2013 which listed only 36 covered employees and (2) a full roster of the 112 covered employees working at that facility. ECF No. 36-16 at 18; ECF No. 37-1 at 20–21. Local 1199 then sent the materials it received from Mr. Alexander to the Fund along with a comparison of the June 2013 remittance report with a list of bargaining unit employees that the union received from Aventura Plaza in March 2013. *Id.*; ECF No. 38-2 at 52, 54, 56.

e.    The Fund's Audit of Defendants' 2011–2013 Records

In late October 2013 the Fund conducted an on-site audit of Defendants' 2011–2013 payroll records according to its normal procedures, comparing the employers' payroll information in tax and unemployment documents with the payroll information Defendants had remitted to the Fund. ECF No. 36-16 at 14–15, 19; ECF No. 37-1 at 22–23. The audit revealed that Defendants had significantly underreported covered employees' hours and consequently substantially underpaid the contributions due during the 2011–2013 period. ECF No. 36-16 at 18–19. The Fund notified Plaintiffs of the audit's findings and requested payment for the amounts it had calculated

---

[4] Although Defendants apparently attempted to include a copy of Mr. Alexander's letter as Exhibit 4 to Andre Joseph's deposition, no such exhibit appears in the documents they have submitted. *See* ECF No. 37-1 at 19. Nevertheless, Plaintiffs do not dispute the accuracy of Defendants' quotes from the letter. *See* ECF No. 46 at 6.

[5] Defendants dispute whether, in light of the information available to it, the Fund should have followed this practice, but they do not dispute that auditing two to three years of records is the Fund's usual practice or that following that practice was the Fund's rationale in selecting the window of records to audit. ECF No. 42 at 4.

Defendants to owe. ECF No. 36-16 at 19; ECF No. 37-1 at 23. Between April and July 2014, the parties negotiated a settlement of the amounts owed under the 2011–2013 audit. ECF No. 36-16 at 19; ECF No. 37-1 at 24. As a result, those amounts are not at issue in this case.

f.     The Fund's Audit of Defendants' 2009–2011 Records

Because the 2011–2013 audit revealed significant underreporting, the Fund decided to audit Defendants' payroll records from 2006–2010. ECF No. 36-16 at 19. Defendants evidently had some difficulty obtaining their payroll records for years before 2009, but they provided the Fund with payroll records for 2009 and 2010. ECF No. 36-16 at 19–20; ECF No. 37-1 at 24; ECF No. 42 at 4. The Fund conducted a payroll audit of those records, which concluded on January 30, 2015. ECF No. 36-16 at 20. Like the prior audit, the 2009–2010 audit found that Defendants had underpaid their contributions for that period because of the underreporting of employees' hours. *Id*; *see also* ECF No. 36-14 (comparing employee hours reported to hours due under the CBAs). Based on the outcome of the 2009–2010 audit, the Fund sent billing letters to Defendants in May 2017, explaining the outcome of the audit and requesting payment for the unpaid contributions, interest, liquidated damages, and testing fees. ECF No. 36-16 at 20; ECF No. 37-1 at 25. When those letters went unanswered, Plaintiffs initiated this action on June 21, 2017. *Id.*; ECF No. 1.

4.     Agreement Terms Defining Employee Eligibility for Pension Contributions

Defendants do not dispute the accuracy of Plaintiffs' damages calculations except to contend that Plaintiffs have applied the incorrect criteria for determining which employees were eligible for pension contributions between October 1, 2010, and December 31, 2010. This argument turns on when the modified eligibility criteria found in appendices to the CBAs became effective ("Pension Appendix" or "Pension Appendices"). Plaintiffs' damages calculations apply these

8

modified eligibility criteria beginning on October 1, 2010, a date drawn from the Pension Appendices themselves. Defendants contend that the modified eligibility criteria did not become effective until January 1, 2011, which they contend is the effective date of a memorandum of agreement ("MOA") Defendants executed with Local 1199. To place that issue in context, a summary of the contested eligibility criteria, the Appendices, and the MOA follows.

The CBAs with Local 1199 required Defendants to make pension contributions on behalf of full-time employees (defined as those that work at least 32 hours per week), and part-time employees on a pro-rated basis. ECF No. 36-1 through 36-6 at ¶¶ 1.6, 26.3. Under the original terms of the CBAs, "per diem employees," defined as those "who have no regular schedule of work, but report to work on an 'on-call' basis as replacement for regular full and part time employees," were not entitled to participate in the pension plan or other benefits. *Id.* at ¶ 1.5.

The CBA for the Sinai Plaza Facility provided that the employer would make these contributions for each covered employee who had worked at the facility for at least 90 days. ECF No. 36-5 at 10, 22. The CBAs for the other Defendants provided that the employer would make contributions for all covered employees with at least one year of service. ECF Nos. 36-1–36-4, 36-6 at ¶ 26.3.

Although the original term for each of the CBAs ended in October 2010, Defendants "continued to abide by the CBAs" thereafter. ECF No. 37-1 at 7. In the summer of 2011, Defendants and Local 1199 engaged in negotiations regarding extending the CBAs and modifying the eligibility criteria for employee pension contributions. *Id.* at 7, 9. As a result of these negotiations, Defendants and Local 1199 executed a Pension Appendix for each Defendant on November 15, 2011. *Id.* at 9; ECF No. 36-9 at 2, 5, 8, 11, 14, 17. Apart from the name of each employer, the Pension Appendices are materially identical for each Defendant.

In relevant part, the Appendices state that "[a]s of October 1, 2010, the Employer agrees to contribute to the Fund . . . for all employees covered by the [CBA]" and provide that "[r]egular full-time and regular part-time employees shall be covered after the completion of 90 days of employment" and that per diem employees are covered once they satisfy certain conditions. ECF No. 36-9 at 2, 5, 8, 11, 14, 17. Each Appendix also explains that "[i]n the event of any inconsistency between this Appendix and the [CBAs], the terms of this Appendix shall prevail." ECF No. 36-9 at 4, 7, 10, 13, 16, 19.

At roughly the same time, Defendants and Local 1199 also entered into the MOA, which modified certain provisions in the CBAs, extended the CBAs' terms through December 31, 2011, and provided that they would continue in effect on a month-to-month basis beginning in January 2012.[6] ECF No. 37-1 at 7; ECF No. 36-10 at 2. The MOA reads, in pertinent part:

> The parties agree to amend and extend the collective bargaining agreement[s] . . . for [Defendants' Facilities] as follows:
>
> 1. Term of Agreement: through December 31, 2011. As of January 1, 2012, the parties agree to extend the agreements on a month to month basis during contract negotiations. Either party may terminate the extension by providing the other not less than ten (10) days notice of termination.
>
> . . . .
>
> 5. No change to pension contributions at each facility, except the employer will begin contributions after 90 days of employment, as required by the pension plan.

ECF No. 36-10 at 2. The MOA attached and incorporated by reference the Pension Appendices. *Id.*

---

[6] Defendants' statement of material facts describes these negotiations as taking place in the summer of 2012, but the MOA is dated November 15, 2011 (the employer signature block is dated January 1, 2012, and the union signature block is dated February 2, 2012), and emails from Local 1199's assistant regional director regarding the negotiations are dated August 18, 2011. ECF No. 38-2 at 15, 17. Accordingly, it would appear that Defendants' references to negotiations taking place in the summer of 2012 are the result of a scrivener's error.

**B.     Procedural Background**

Plaintiffs filed their original complaint in this case on June 21, 2017. ECF No. 1. In it, they sought delinquent contributions due under the audit for the 2009–2010 period; other delinquent contributions for certain months between November 2013 and February 2017; interest, liquidated damages, testing fees, attorney's fees and costs; and declaratory and injunctive relief. ECF No. 1 at 12–24. The parties settled the claims for delinquent contributions unrelated to the 2009–2010 audit, and in February 2018, Plaintiffs filed a first amended complaint to narrow the issues before the Court. ECF No. 19 at 2; ECF No. 20; ECF No. 36-16 at 20 nn.2–3. As a result of discovery, the Fund revised its audit to correct certain errors in calculating the amounts due under the audit. ECF No. 37-1 at 26–27. In July and August 2018, Plaintiffs filed their second and third amended complaints to reflect the revised amounts due under the Fund's post-discovery audit revisions. ECF No. 24; ECF No. 28; ECF No. 36-16 at 20–21 n.3; ECF No. 37-1 at 26–27. Plaintiffs seek judgment against each defendant in the following amounts:

(1) $120,927.27 against Arch Plaza, Inc.;

(2) $106,832.58 against Hebrew Homes South, Inc.;

(3) $112,116.18 against Aventura Plaza, Inc.;

(4) $101,888.46 against Jackson Plaza, Inc.; and

(5) $240,218.59 against Hebrew Home Sinai, Inc.

These amounts include all delinquent contributions, testing fees, liquidated damages, and interest calculated through July 21, 2018, the date of Plaintiffs' last revision to their damages calculations. Plaintiffs also seek an award of additional pre-judgment interest since that date accruing at a rate of 10 percent per year and post-judgment interest.

The parties' cross-motions for summary judgment are now ripe for adjudication. ECF Nos. 36–37.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In adjudicating such a motion, all reasonable inferences from the facts in the record must be made in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. To prevail on such a motion, the moving party must show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To do this, it may cite the record, including "affidavits or declarations." Fed. R. Civ. P. 56(c)(1)(A). Factual assertions made in the moving party's affidavits or declarations may be accepted as true in the absence of contrary assertions made in affidavits, declarations, or documentary evidence submitted by the nonmoving party. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

For issues on which the nonmoving party would bear the ultimate burden of proof, a party moving for summary judgment can carry its burden on the summary judgment motion by pointing out "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party carries its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, it must show that a rational trier of fact could find in its favor. *Id.* Thus, "'conclusory allegations' and 'unsubstantiated spec-

ulation,' whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, 'do not create genuine issues of material fact.'" *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (quoting *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 200 n.12 (D.D.C. 2008)), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015). Nor can a sufficiently supported motion for summary judgment be defeated by statements and evidence that is "rendered unreasonable given other undisputed evidence in the record." *Id.* at 74; *see also Wadley v. Aspillaga*, 209 F. Supp. 2d 119, 125 (D.D.C. 2002) (granting motion for summary judgment where "facts and arguments proffered by plaintiffs are immaterial, illogical, or conclusory").

### III.  DISCUSSION

Plaintiffs move for summary judgment as to liability, the amount of damages, and their entitlement to equitable and declaratory relief. ECF No. 36 at 1. Defendants cross move for summary judgment on the issue of liability. Defendants do not generally contest that they underreported and underpaid their contributions to the Fund for the 2009–2010 period. Rather, they argue that Plaintiffs' claims are untimely. ECF No. 37 at 1; ECF No. 37-2 at 6–7. They also argue that they should be granted summary judgment as to liability for one of their facilities, South Pointe Plaza, because that entity's overpayments in fact exceeded its underpayments during the years in question. ECF No. 37-2 at 15.

The Court should deny Defendants' motion in full and grant Plaintiff's motion in part. As explained below, Plaintiffs' claims were filed well within Florida's five-year statute of limitations that should be applied to this action. The undersigned also finds that Plaintiffs have used the correct eligibility criteria for determining the amount of the delinquent contributions due from Defendants, and therefore recommends granting Plaintiffs summary judgment as to their measure

of damages. That said, the Court should deny Plaintiffs' claims for injunctive relief because they have not demonstrated that such relief is appropriate in this case. Finally, the Court should deny Defendants' motion for summary judgment on the issue of South Pointe Plaza's liability even though Plaintiffs' audit found the facility's overpayments exceeded its underpayments during the years in question.

### A.   Timeliness of Claims

In their motion, Plaintiffs argue that their delinquent contribution claims are timely because Florida's five-year statute of limitations for breach of contract actions applies, and, in the alternative, that their claims did not accrue until January 2015—two and one-half years before they filed suit—when Plaintiffs completed their audit of Defendants' 2009–2010 payroll records. ECF No. 36-17 at 17–20. Not surprisingly, Defendants disagree. They contend that the applicable limitations period is the District of Columbia's three-year statute of limitations for contract claims, and that Plaintiffs claims accrued no later than August 22, 2013–nearly four years prior to the filing of the original complaint—when Plaintiffs should have discovered the underpayments at issue had they exercised due diligence. ECF No. 37-2 at 26. For the reasons that follow, the undersigned recommends finding that Florida's five-year statute of limitations applies, and that Plaintiffs' claims are timely.

#### 1.   Which Statute of Limitations Applies

Although ERISA provides a statute of limitations for fiduciary claims, *see* 29 U.S.C. § 1113, it does not contain a statute of limitations for delinquent contribution claims like those at issue in this case. *See Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C. Cir. 1991). Courts hearing ERISA delinquent contribution claims in this district generally apply the District of Columbia's three-year statute of limitations for breach of contract actions because it is "the most

closely analogous statute of limitations from the state in which the court sits." *Connors*, 935 F.2d at 341; D.C. Code § 12-301(7); *see also Kifafi v. Hilton Hotels Ret. Plan*, 616 F. Supp. 2d 7, 36 (D.D.C. 2009), *aff'd.* 701 F.3d 718 (D.C. Cir. 2012) ("Because employee benefit plans are contracts, courts in this jurisdiction have borrowed the statute of limitations provision for breach of contract actions in the District of Columbia."). Defendants seek application of that rule to Plaintiffs' claims. ECF No. 37-2 at 17; ECF No. 41 at 5–9. However, the D.C. Circuit has recognized that "in the absence of a controlling statute to the contrary, the parties to a . . . potential lawsuit may, by agreement, modify a statutory period of limitation." *Hunter-Boykin v. George Washington Univ.*, 132 F.3d 77, 79 (D.C. Cir. 1998) (emphasis omitted) (quoting 54 C.J.S. *Limitations of Actions* § 25). That is what happened here. Properly read, the parties' agreement directs that Florida's five-year statute of limitations should be applied to actions like this one seeking to collect delinquent contributions for the benefit of employees, the majority of which worked in Florida. Given that contractual language and ERISA's lack of a limitations period for delinquent contribution claims, Florida's five-year statute of limitations should be used to evaluate the timeliness of Plaintiffs' action.

Under the CBAs, the parties agreed "to be bound by the provisions of the [Trust Agreement] establishing the Fund, as it may from time to time be amended, and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by that agreement." ECF Nos. 36-1 through 36-6 at ¶ 26.4. Amendment Three to the Trust Agreement, in turn, provides:

> In *any action* by the Trust to collect delinquent contributions from contributing employers to the Trust, the limitations period for such action shall be governed by the law of the state in which all or the majority of the employees on whose behalf the contributing employer makes contributions work, unless such limitations period is less than three years, in which case the limitation period under the law of the District of Columbia shall govern.

ECF No. 39-1 at 17 (emphasis added). Application of Amendment Three to the facts of this case establishes Florida's five-year limitations period as the operative statute of limitations. Plaintiffs' complaint is an "action" by the Fund to "collect delinquent contributions from contributing employers to the Trust," thus triggering the amendment. It is undisputed that "the majority of the employees on whose behalf [Defendants] make contributions" work in Florida. ECF No. 36-16 at 2–3; ECF No. 37-1 at 2–4. As between Florida's different statutory limitations periods, there is also no dispute that it is Florida's five-year limitations period for breach of contract actions that would be applicable to an ERISA claim seeking delinquent contributions under a CBA. *See Kifafi*, 616 F. Supp. 2d at 36 (applying state's breach of contract statute of limitation to ERISA delinquent contribution claim); *Connors*, 935 F.2d at 341 (same); Fla. Stat. § 95.11(2)(b) (establishing a five-year statute of limitations for contract claims); *see also* ECF No. 37-2 at 17 (arguing that a statute of limitations for breach of contract claims should apply); ECF No. 41 at 7 (same). Thus, under the amendment, it is that five-year limitations period that should be applied here.

Defendants do not dispute any of this. That is, they do not dispute how the amendment would operate were it applicable to Plaintiffs' action. Nor do they dispute that the amendment is valid or enforceable against them. They do not argue, for example, that they are not bound by the amendment through their CBAs, because adoption of the amendment was a unilateral act of the Trustees amending the Trust Agreement.[7] ECF No. 48 at 7 ("As the Pension Fund notes in its Opposition, Defendants did not challenge the Trust Amendment No. 3 . . . The Plaza Facilities only dispute the Pension Fund's misguided attempt for retroactive application of the Amendment. . . . ."). Rather, Defendants contend that the amendment's designation of a limitations period for

---

[7] Nor would such an argument be persuasive. Defendants agreed, through their CBAs, "to be bound by the provisions of the [Trust Agreement] establishing the Fund, as it may from time to time be amended, and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by that agreement." ECF Nos. 36-1 through 36-6 at ¶ 26.4.

delinquent contribution actions applies only to *claims that accrued* after November 12, 2013, the effective date of the amendment's adoption by the Trustees. ECF No. 41 at 8–9. According to Defendants, claims accruing prior to that date should be subject to D.C.'s three-year statute of limitations. *Id.*

But that is not what Amendment Three says. Its language does not limit its application to *claims* accruing after the amendment's adoption. Indeed, it makes no reference to claims or their accrual, whatsoever. Again, the limitations period prescribed in the amendment operates "*in any action* by the Trust to collect delinquent contributions from contributing employers to the Trust." ECF No. 39-1 at 17 (emphasis added). Its language is thus focused on *actions* without reference to when the claims on which a given action is based accrued. *Compare Action*, Black's Law Dictionary (11th ed. 2019) ("A civil or criminal judicial proceeding.") *with Claim*, Black's Law Dictionary (11th ed. 2019) ("An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; Cause of Action."); *cf. RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 800 F. Supp. 2d 182, 190 (D.D.C. 2011), *aff'd*, 682 F.3d 1043 (D.C. Cir. 2012) (discussing the doctrine of *res judicata* and distinguishing between claims and actions). Moreover, "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Norfolk S. Railway Co. v. Kirby*, 534 U.S. 14, 31 (2004) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). This case being such an action, application of the amendment's language is straightforward.

Defendants respond by focusing not on the amendment's language—there being little for them to gain there—but on the perceived "retroactivity" that the amendment imposes. Defendants object to delinquent contribution claims that may have otherwise been deemed extinguished under D.C.'s three-year statute of limitations, living on through application of the Amendment Three's

choice of Florida's five-year limitations period. Of course, that is the very nature of contractual provisions choosing between competing statutes of limitations: some claims that would otherwise be barred may be allowed by the parties' agreement.[8] Nevertheless, Defendants assert that the "enlargement of a statute of limitations," which it contends Amendment Three accomplished, may not operate retroactively as it would violate the "well settled 'presumption against retroactive legislation.'" ECF No. 48 at 9 (quoting *Casey v. Ward*, 67 F. Supp. 3d 54, 57 (D.D.C. 2015)). This argument is inapt. To state the obvious, the presumption against retroactive legislation is an interpretive doctrine that applies to legislation, not private contracts. *See, e.g., Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994) ("If [a] *statute* would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."

---

[8] There is a hint of sour grapes in Defendants' argument. But while Amendment Three's rule for selecting the limitations periods might work to the Fund's benefit in this case, it is not unfair, much less unreasonable. *Cf. Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 768 (D.C. Cir. 1992) ("[C]ourts should honor a contractual choice-of-law provision . . . unless the party challenging the enforcement of the provision can establish that 'enforcement would be unreasonable and unjust,' 'the clause was invalid for such reasons as fraud or overreaching,' or 'enforcement would contravene a strong public policy of the forum in which suit is brought.'" (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972))). Amendment Three's rule for selecting limitations periods is at least as reasonable as the borrowing rule in *Connors. See Connors*, 935 F.2d at 341. Given the many venue options available to a pension fund bringing an action under ERISA, *see* 29 U.S.C. § 1132(e)(2) (permitting ERISA actions to be brought either "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found."), the borrowing rule could subject a putative defendant to a variety of different statutes of limitations. *Compare Robbins v. Iowa Rd. Builders Co.*, 828 F.2d 1348, 1355 (8th Cir. 1987) (borrowing Iowa's ten-year statute of limitations for written contracts), *with Pierce Cty. Hotel Employees & Rest. Employees Health Tr. v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1328 (9th Cir. 1987) (borrowing Washington State's six-year statute of limitations for breach of contract claims). By contrast, Amendment Three narrows those options to one. Regardless of where the Fund brings its action, the limitations period that applies will either be that of the state where a majority of the defendant's pension-eligible employees work or the District of Columbia's three-year limitations period, whichever is longer. *See* ECF No. 39-1 at 17. That calculus may work to the Fund's advantage in some cases but not in others. For example, in an action filed in a forum with a longer statute of limitations than that provided by the state where a majority of the defendant's employees work, Amendment Three would lead to a limitations period shorter than that which would be produced through application of the borrowing rule. Amendment Three is, therefore, something of a "win some, lose some" proposition for the parties. While that result may seem random, because it focuses on where the putative defendant's employees work, application of Amendment Three is at least as predictable as the *Connors* rule, which leaves defendants to guess which forum state's limitations period for breach of contract might apply to the Fund's claims. There are 1,082 employers participating in the Fund, ECF No. 36-16 at 14, and it appears reasonable for the Trustees to have adopted a rule that increases predictability for those employers without systematically advantaging the Fund. In any event, it would be difficult to argue—and Defendants make no attempt to do so—that Amendment Three's choice of the contract limitations period of the state where the majority of the employees whose pensions are at stake work, is unreasonable. Indeed, it appears from the amended complaint that Defendants are Florida corporations doing business in Florida. ECF No. 28 at 3–6. They can hardly be heard to complain, then, that application of their home forum's law is unfair.

(emphasis added)).  It is motivated by concerns about the reach of state power, and fair process due the governed, that are raised by, and unique to, the legislative context.  *Id.* at 286 ("The presumption against statutory retroactivity is founded upon sound considerations of general policy and practice and accords with long held and widely shared expectations about the usual operation of legislation.").  No such presumption is applicable to private contracts.  To the contrary, retroactive provisions are not unusual in contracts and courts give them full force and effect, even in collective bargaining agreements.  *See, e.g., Spectrum Health–Kent Cmty. Campus v. N.L.R.B.*, 647 F.3d 341, 346 (D.C. Cir. 2011) (discussing CBA provisions, including changes to retirement and health plans, had retroactive effect preceding the effective date of the agreement); *Winery, Distillery & Allied Workers Union, Local 186 v. E & J Gallo Winery, Inc.*, 857 F.2d 1353, 1357–58 (9th Cir. 1988) (giving retroactive effect to CBA provisions such that they applied to the interim period between the previous contract's expiration and the new one's execution).

Perhaps Defendants' retroactivity argument would be more persuasive had this action been filed prior to the effective date of the Amendment Three's adoption.  But that is not what happened here.  Plaintiffs' complaint was filed over three years after the Trustees adopted the amendment.  Because Plaintiffs' amended complaint is an "action by the Trust to collect delinquent contributions from contributing employers to the Trust [Defendants]" (ECF No. 39-1 at 17) filed after the Trustees adopted Amendment Three, the plain language of the parties' agreement directs that Florida's five-year statute of limitations should be applied.

Defendants' other argument seeking to avoid this result fails.  They contend that Yolanda Montgomery, a Deputy Director and Associate Counsel at the Fund, admitted in her deposition that Amendment Three "only operates prospectively." ECF No. 48 at 9.  This argument is unper-

suasive for two reasons. First, it attempts to use parol evidence to contradict the parties' unambiguous writing as to the amendment's applicability and operation in this action. *See Commonwealth Commc'ns, Inc. v. N.L.R.B.*, 312 F.3d 465, 468 (D.C. Cir. 2002) ("In the absence of ambiguity in the collective bargaining agreement [] [courts] have no cause to examine extrinsic evidence of the parties' intent." (quoting *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 940 F.2d 704, 708 (D.C. Cir. 1991))); *see also Musto v. Am. Gen. Corp.*, 861 F.2d 897, 910 (6th Cir. 1988) (holding that "the clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer" and collecting cases); *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151–56 (7th Cir. 1989) (Easterbrook, J.) (discussing the hazards of permitting extrinsic evidence to contradict pension agreements and observing that ERISA section 515 "prevents a court from giving force to oral understandings . . . that contradict the writings.").

In any event, the deposition passage, reproduced below, contains no admission that the amendment applies only to claims which accrue after the effective date of the its adoption:

Q     This, again, trust agreement by virtue of your prior statements automatically goes into effect and thereby binds contributing employers after it has been approved by the Board of Trustees.

A     Yes.

Q     Again, the reason that this affects or impacts contributing employers is based on their agreement as set forth in their collective bargaining agreements with individual local unions to comply with the terms of the trust agreement. Is that your understanding?

A     Can you repeat that again?

Q     So, in other words, this Amendment Number 3 or modification to the trust agreement has been approved by the board of directors as you have testified.

So my question is, based on your prior testimony, once the board of directors, Board of Trustees has modified the trust agreement, automatically all of the contributing employers are bound by the terms of that modification

20

to the trust agreement by virtue of their agreement in collective bargaining agreements to comply with the trust agreement. Is that correct?

A Correct.

ECF No. 38-3 at 9. That confusing back-and-forth between Defendants' counsel and the witness provides no support for their argument seeking to avoid application of Amendment Three. Ms. Montgomery does not state that the amendment was intended to be applicable only to claims accruing after its effective date. In context, her responses were not directed to the operation of the amendment at all, but to the process by which it was incorporated into the Trust Agreement and, by extension, the CBA. That is, Ms. Montgomery testified that the amendment applies to all participating employers by operation of law upon its ratification by the Trustees. That is not, as Defendants claim, an admission that the amendment applies only prospectively to claims accruing after its effective date. Indeed, that testimony could easily be read to support the position that, once Amendment Three was approved only later-filed actions would be governed by its terms. After all, Ms. Montgomery agrees that the modification "automatically" binds "all of the contributing employers." *Id.*

In light of the amendment's plain language the relevant rule is the one noted above: "[I]n the absence of a controlling statute to the contrary, the parties to a . . . potential lawsuit may, by agreement, modify a statutory period of limitation." *Hunter-Boykin*, 132 F.3d at 79 (emphasis omitted) (quoting 54 C.J.S. *Limitations of Actions* § 25); *see also Milanovich*, 954 F.2d at 768 ("[C]ourts should honor a contractual choice-of-law provision . . . unless the party challenging the enforcement of the provision can establish that 'enforcement would be unreasonable and unjust,' 'the clause was invalid for such reasons as fraud or overreaching,' or 'enforcement would contravene a strong public policy of the forum in which suit is brought.'" (quoting *M/S Bremen*, 407 U.S. at 15)). Here, no statute prohibits the parties from agreeing to modify the limitations period that

may otherwise apply to this case. As noted previously, ERISA does not specify any particular statute of limitations for nonfiduciary claims. *See Connors*, 935 F.2d at 341. Where, as here, there has been no showing that application of their agreement's contractual limitations period would be unreasonable or contrary to federal policy, the parties' agreement should control. *See Wang Labs., Inc. v. Kagan,* 990 F.2d 1126, 1128–29 (9th Cir. 1993) ("In an ERISA case, we ordinarily borrow the forum state's statute of limitations so long as application of the state statute's time period would not impede effectuation of federal policy . . . . [However,] [w]here a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair."); *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 816 (7th Cir. 2010) (applying Pennsylvania's statute of limitations to ERISA nonfiduciary claims brought in Illinois based on the parties' agreement and a contractual choice of law provision).

### 2. Accrual of Claims

The parties devote considerable effort to arguing about when Plaintiffs' claims accrued for purposes of assessing their timeliness. *See* ECF No. 36-17 at 19–20; ECF No. 37-2 at 19–26; ECF No. 40 at 8–24; ECF No. 41 at 9–25; ECF No. 47 at 8–12; ECF No. 48 at 9–20. As explained below, application of Florida's five-year statute of limitations avoids the major points of contention that application of D.C.'s three-year statute of limitations would otherwise raise.

The D.C. Circuit made clear in *Connors* that courts should use the "discovery rule" to determine the date of accrual of ERISA delinquent contribution claims. *See Connors*, 935 F.2d at 343. Under that rule, contribution claims accrue when the plaintiff knew or should have discovered the employer's underpayments. *Id.* at 342–43. Application of the discovery rule is necessary in this context because the failure to make contributions is "likely to be a hidden injury" that is "accessible in the first instance only to the [employers]." *Id.* at 342. Despite employers' duty to make

regular reports, "the [fund] Trustees remain dependent upon the [employers'] honesty and accuracy: the records with which the Trustees might verify the accuracy of the [employers'] reporting—as well as the accuracy of their contributions—both originate and stay with the [employers]." *Id.* at 342–43. The question that courts must answer, then, is when a pension fund "discovered, or with due diligence should have discovered, the injury." *Id.* at 342.

Here, Plaintiffs filed their original complaint in June 2017.[9] ECF No. 1. Under Florida's five-year statute of limitations, their claims are therefore timely as long as they accrued, through operation of the discovery rule, after June 2012. Every event that Defendants argue put or should have put Plaintiffs on notice of the 2009-2010 delinquencies occurred after June 2012, including: (a) January 2013, when Plaintiffs filed their lawsuit in Florida; (b) March 2013, when they settled that lawsuit; (c) August 2013, when the Fund received Michael Alexander's report regarding certain delinquencies by Defendants and a list of their current employees; or (d) October 2013, when the Fund's auditors received employee lists from Defendants' human resources director.[10] ECF No. 37-2 at 26; ECF No. 41 at 16.

The only significant event discussed in Defendants' briefs that occurred before June 2012 is Plaintiffs' failure to exercise their right to audit Defendants in 2009. Yet even Defendants do not suggest that that failure caused Plaintiffs' claims to accrue. ECF No. 41 at 17. Defendants

---

[9] Defendants do not contest that Plaintiffs' third amended complaint relates back to June 21, 2017, the filing date of the original complaint, because the successive amended complaints either withdrew claims included in the original complaint or merely revised Plaintiffs' damages calculations. *See* Fed. R. Civ. P. 15(c)(1) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."); *cf. United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002) ("[W]hile amendments that expand upon or clarify facts previously alleged will typically relate back, those that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously."); *see also* ECF No. 36-16 at 20–21 & nn. 2–3 (explaining that Plaintiffs' amended complaints withdrew certain claims that settled and corrected Plaintiffs' damages calculations based on revisions to the audit).

[10] For their part, Plaintiffs argue that their claims did not accrue until they completed their audit of Defendants' payroll records in January 2015 and discovered their underpayment of contributions in 2009-2010. ECF No. 47 at 5.

argue that it put Plaintiffs on notice that they had not yet audited Defendants, but not that it alone put them on notice of the claims in this case. *See id.* at 16, 21–23 (explaining that the failure to perform the 2009 audit was "information known [to Plaintiffs] as of August 22, 2013," and arguing that "[b]ased on all of the information received [] as of August 22, 2013, the Pension Fund failed to exercise due diligence").

In any event, the *Connors* court rejected the argument that a failure to exercise a right to audit is alone sufficient to trigger accrual of a delinquent contribution claim. *Connors*, 935 F.2d at 343. Indeed, one of the reasons the court of appeals adopted the discovery rule for such claims is because "[a]uditing . . . even if pursued with the utmost diligence," cannot ensure compliance. *Id.*; *see also Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1282 (3d Cir. 1991) (rejecting an employer's argument that a pension fund's "failure to exercise their right to audit demonstrates a lack of reasonable diligence"). Accordingly, because the earliest accrual date Defendants have proposed for Plaintiffs claims is January 2013—a date well-within Florida's five-year limitations period—the Court should grant Plaintiffs summary judgment as to liability and deny the Defendants' cross motion for summary judgment on that issue.[11]

---

[11] Should the Court find that the District of Columbia's three-year limitations period applies, the undersigned recommends denying the parties' cross-motions for summary judgment on that issue because a material dispute exists between the parties concerning whether the information available to the Plaintiffs as of June 2014–three years before filing suit—was sufficient to trigger accrual of the 2009-2010 delinquent contribution claims. *See* ECF No. 37-2 at 26 (arguing that "depending on the level of due diligence necessary" Plaintiffs' claims accrued sometime between January 2013 and October 2013); ECF No. 47 at 8 (arguing that Plaintiffs "could not have known about the Defendants' delinquencies at issue in this case until [they] reviewed Defendants' payroll records" in January 2015); *see also Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996) ("Summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury." (quoting *Byers v. Burleson*, 713 F.2d 856, 861 (D.C. Cir. 1983))); *cf. U.S. ex rel. Miller v. Bill Harbert Int'l Const.*, 505 F. Supp. 2d 1, 12–18 (D.D.C. 2007) (finding after conducting an evidentiary hearing that government attorneys failed to exercise due diligence for purposes of the discovery rule).

**B.** **Damages**

As for damages, Plaintiffs contend that Defendants owe them $847,290.62 for delinquent contributions from the 2009-2010 period, Pension Protection Act surcharges and supplemental contributions, interest, liquidated damages, and audit fees. ECF No. 36-16 at 23; ECF No. 36-17 at 11–15. Plaintiffs support their damages calculations with an affidavit from Andre Joseph, the Fund's Payroll Review Manager, who describes the methodology used for assessing unpaid contributions, interest, and liquidated damages resulting from the audit of Defendants' 2009–2010 payroll records. ECF No. 36-16 at 19–20; ECF No. 36-15 at 14–16, 19–20. During the audit, Plaintiffs reviewed Defendants' remittance reports and compared them with Defendants' tax, unemployment, and payroll records to verify that Defendants did not exclude any eligible employees and that Defendants accurately reported their hours worked and salaries. ECF No. 36-15 at 14–15. When the audit revealed that Defendants had underreported covered employees' hours, the Fund determined the extent of the delinquent contributions and assessed interest and liquidated damages. *Id.*

Based on that audit, Plaintiffs have summarized their findings in spreadsheets detailing the amounts that Defendants were obligated to contribute each month on behalf of each covered employee, the amounts Defendants actually paid, and a resulting calculation of the amounts of under- or over-payment. *See* ECF No. 36-16 at 21–23; ECF No. 36-15 at 19–23; *see also, generally,* ECF No. 36-14. Based on these calculations, Plaintiffs determined Defendants' liability for liquidated damages, testing fees, other surcharges and supplemental contributions, and interest through July 21, 2018. *Id.* at 2–3. Plaintiffs' damages calculations with respect to each Defendant are summarized in the table below:

| | Arch Plaza | Hebrew Homes South | Aventura Plaza | Jackson Plaza | Sinai Plaza | TOTAL |
|---|---|---|---|---|---|---|
| Delinquent Contributions | $42,923.81 | $37,557.61 | $39,615.60 | $95,325.17 | $85,263.52 | $300,685.71 |
| Interest through 7/21/2018 | $37,530.37 | $33,458.74 | $34,382.49 | $82,902.05 | $74,036.16 | $262,309.81 |
| Liquidated Damages | $37,530.37 | $33,458.74 | $34,382.49 | $82,902.05 | $74,036.16 | $262,309.81 |
| Testing Fee | $944.80 | $944.80 | $944.80 | $413.35 | $944.80 | $4,192.55 |
| Overpayment | ($570.83) | ($349.09) | - | - | - | ($919.92) |
| Rehabilitation Plan Supplemental Contributions | $509.66 | $230.38 | $914.10 | $1,569.69 | $1,412.00 | $4,635.83 |
| PPA Surcharges | $2,059.09 | $1,531.40 | $1,876.70 | $4,993.60 | $4,525.95 | $14,986.74 |
| TOTAL | $120,927.27 | $106,832.58 | $112,116.18 | $268,105.91 | $240,218.59 | $848,200.53 |

ECF No. 36-17 at 11–13; ECF No. 36-14 at 2–3; ECF No. 36-18 at 1–2.

Defendants do not dispute that they underpaid the Fund during the 2009–2010 time period. Nor do they dispute Plaintiffs' damages calculations, except to argue that they rely on erroneous employee eligibility criteria during a three month period at the end of 2010. *See* ECF No. 42 at 5. As explained below, the undersigned recommends finding that Plaintiffs have applied the correct eligibility criteria. Accordingly, because Defendants have not demonstrated that there are any material facts in dispute as to the calculation of damages, the undersigned recommends granting summary judgment for Plaintiffs on that issue as well.

1.    Employee Eligibility Criteria

The parties' arguments concerning the calculation of damages center on Plaintiffs' treatment of Defendants' obligation to make pension contributions for regular and per diem employees during the period between October 1, 2010 and December 31, 2010. Under the original terms of the CBAs, Defendants were obligated to make pension contributions only on behalf of regular employees who had worked for at least 90 days at the Sinai Plaza Facility (ECF No. 36-5 at 10, 22), or one year at Defendants' other facilities (ECF Nos. 36-1 through 36-4, 36-6 at ¶ 26.3).

Defendants were not obligated to make any pension contributions on behalf of per diem employees.[12] ECF Nos. 36-1 through 36-6 at ¶ 1.5. The Pension Appendix applicable to each Defendant, however, loosened those eligibility criteria. Under the Appendices, Defendants were obligated to make pension contributions for all regular employees at any facility after 90 days of employment, and for per diem employees after 1,000 hours in their first year of employment or in the following calendar year. ECF No. 36-9. Plaintiffs' damages calculation applies that modified eligibility criteria to the three-month period during which they assert the Appendices were operative in 2010, i.e., between October 1, 2010, and December 31, 2010. ECF No. 47 at 14–15.

Defendants, on the other hand, contend that the Appendices' less restrictive eligibility criteria were not operative until January 1, 2011, the effective date of Defendants' MOA which extended the CBAs and incorporated the Appendices by reference. ECF No. 41 at 27; ECF No. 36-10 at 2. If correct, Defendants would have no obligation during the last three months of 2010 to make pension contributions on behalf of any of their per diem employees or regular employees who did not meet the CBAs' original, more restrictive time-in-service requirements.[13]

Plaintiffs' interpretation is correct. While the Pension Appendices were executed on November 15, 2011, they expressly make the less restrictive employee eligibility criteria they contain operative as of October 1, 2010. Specifically, Section 3 of each Appendix states, in relevant part:

> *As of October 1, 2010*, the Employer agrees to contribute to the Fund . . . for all employees covered by the Collective Bargaining Agreement. Regular full-time and regular part-time employees shall be covered after the completion of 90 days of employment, measured from their date of hire. Employees who are not regular

---

[12] Recall, the CBAs define regular employees to include both full- and part-time employees who work a regular schedule. ECF No. 36-1 through 36-6 at ¶ 1.6. Per diem employees are defined as those employees without a regular schedule who work on an on-call or as-needed basis. *Id.* at ¶ 1.5.

[13] Neither party has provided a calculation of the impact this potential error would have on Plaintiffs' computations, but the total amount of damages would clearly be less than what Plaintiffs are seeking.

full-time or regular part-time . . . shall be covered after they . . . [have] worked, or been compensated, for one thousand (1,000) hours or more during the twelve month period beginning twitch the employee's date of hire. If such an employee does not work, or is not compensated for, at least 1,000 hours during his first year of employment, the computation period shall be based on the calendar year beginning after the end of his first year of employment.

ECF No. 36-9 at 2, 5, 8, 11, 14, 17 (emphasis added).

Notwithstanding this plain language, Defendants argue the Pension Appendices did not go into effect on October 1, 2011, because the MOA, which was not signed until November 12, 2011, operated as a constraint on the Appendices. ECF No. 41 at 26–28. But this cannot be true. The Pension Appendix includes a provision explaining that "[i]n the event of any inconsistency between this Appendix and the [CBA], the terms of this Appendix shall prevail." ECF No. 36-9 at 4, 7, 10, 13, 16, 19. That is, because the MOA is an amendment to the CBA, even if the MOA did purport to operate as a constraint on the Pension Appendix's retroactive application, as Defendants allege, the terms of the Pension Appendix would control. *See* ECF No. 36-9. Moreover, the MOA does not conflict with the Pension Appendix. Indeed, the MOA expressly references and attaches the Appendices, including its retroactive effective date for the less restrictive employee eligibility criteria they contain. ECF No. 36-10 at 2. Further, the MOA states that the parties intend no change to the "pension contributions at each facility, *except* the employer will begin contributions after 90 days of employment, *as required by the pension plan (Pensions Appendices attached)*." *Id.* (emphasis added). Thus, both the MOA and the Pension Appendices make reference to those modified eligibility requirements.

Defendants' other arguments seeking to overturn this straightforward interpretation of the language of the Pension Appendices are not persuasive. First, they contend that the unilateral change doctrine under the National Labor Relations Act ("NLRA") prevented the parties from making any changes to Defendants' pension contribution obligations until the effective date of the

MOA because "an expired collective bargaining agreement . . . continues to be effective until a subsequent agreement is reached or the parties negotiate to impasse." ECF No. 41 at 27 (citing *Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 198–200 (1991)). Second, they assert, based on extrinsic evidence, that Defendants and Local 1199 had an understanding that, notwithstanding its text, that each Appendix became effective only on January 1, 2011. ECF No. 41 at 26–28. Neither argument is successful.

To begin, Defendants' invocation of the NLRA is perplexing. Under the unilateral change doctrine, an employer violates its duty to bargain in good faith, thereby committing an unfair labor practice under the NLRA, when it changes the terms or conditions of employment without first bargaining with the employees' representatives. *See, generally, N.L.R.B. v. Katz*, 369 U.S. 736 (1962); *see also Litton*, 501 U.S. at 205–08 (finding the unilateral change doctrine did not extend to an employer's refusal to arbitrate layoffs it conducted in the period after a collective bargaining agreement expired). Since Plaintiffs have not alleged Defendants breached their duties under the NLRA, they appear to be suggesting that the unilateral change doctrine somehow prevents a subsequent agreement between an employer and a union from retroactively applying to a period during which a CBA was expired. But Defendants have not presented any authority for this proposition— probably because it is incorrect.

The Supreme Court has cautioned district courts against interpreting claims under ERISA sections 515 and 502(g)(2) as implicating an employer's duties under the NLRA. *See Laborers Health & Welfare Tr. Fund For N. California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 548–49 (1988) ("[B]oth the text and the legislative history of §§ 515 and 502(g)(2) provide firm support for the Court of Appeals' conclusion that this remedy is limited to the collection of 'promised contributions' and does not confer jurisdiction on district courts to determine whether

an employer's unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA."). Moreover, it is undisputed that the MOA and Pension Appendices were the product of bargaining between Defendants and the union; that is, they were not *unilateral* changes. ECF No. 37-1 at 8–9 (explaining that the MOA, which incorporated the Pension Appendices, was the product of collective bargaining negotiations between Local 1199 Vice President Dale Ewart and Defendants' CEO Dr. William Zubkoff). Further, courts routinely interpret CBA provisions to apply retroactively. *See, e.g., Spectrum Health*, 647 F.3d at 346 (finding CBA provisions, including changes to retirement and health plans, had retroactive effect preceding the effective date of the agreement); *E & J Gallo Winery*, 857 F.2d at 1357 (giving retroactive effect to CBA provisions such that they applied to the interim period between the previous contract's expiration and the new one's execution).

Defendants' other argument that extrinsic evidence, including emails from Local 1199,[14] indicate that the union and Defendants intended that the MOA and the Pension Appendices should only apply prospectively, is not well taken. The emails in question are consistent with the terms of the final executed MOA; their explanation that the "Term of Agreement" of the MOA would be "January 1, 2011 through December 31, 2011" does not preclude the retroactive application of the Pension Appendices, especially because the email explains that the changes to Defendants' pension obligations are "as required by the pension plan." ECF No. 38-2 at 15, 17. Nevertheless, to the extent that these emails could be construed as contradicting the unambiguous terms of the

---

[14] Defendants have submitted two emails dated August 18, 2011, sent by an assistant regional director of Local 1199 to Dr. William Zubkoff, Defendants' CEO who negotiated the MOA and Appendices on behalf of Defendants. ECF No. 37-1 at 8; ECF No. 38-2 at 15, 17. The emails describe the proposed terms for the MOA and describe the "Term of Agreement" as "January 1, 2011 through December 31, 2011." ECF No. 38-2 at 15, 17. All other terms are consistent with the final MOA. *Id.* Plaintiffs have also submitted a handwritten draft of the MOA dated August 18, 2011. ECF No. 36-10 at 3–5. The terms of the handwritten version are consistent with the typed version Defendants executed with Local 1199, except that the term of the agreement is described as "Effective and retro-active to: January 1, 2011," and that phrase is repeated at the beginning of the paragraphs describing changes to wages and minimum pay rates. *Id.*

Appendices, the undersigned recommends finding that they are barred by the parol evidence rule. *See Commonwealth Commc'ns, Inc.*, 312 F.3d at 468 ("In the absence of ambiguity in the collective bargaining agreement [] [courts] have no cause to examine extrinsic evidence of the parties' intent."); *see also Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157–58 (9th Cir. 2000) ("Although the parol evidence rule is not applied as strictly in the context of collective bargaining agreements, it still operates to bar extrinsic evidence of an agreement inconsistent with an unambiguous writing." (footnote omitted)).

For these reasons, the undersigned recommends finding that the Pension Appendices obligated Defendants to make contributions for covered per diem employees after working 1,000 hours in their first year of employment, or else in the following calendar year, and for regular full- and part-time employees after 90 days of employment. It is undisputed that Plaintiffs used that criteria in their damages calculations. *See* ECF No. 41 at 26; ECF No. 47 at 15. The Court therefore should find that Plaintiffs applied the correct eligibility criteria in calculating their damages.

2.    Calculation of Damages

"When damages under an ERISA multiemployer pension plan are in dispute, an employer opposing summary judgment must . . . 'point to specific facts in the record to demonstrate a genuine issue for trial.'" *Serv. Employees Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 374 (D.D.C. 2016) (quoting *Flynn v. Dick Corp.*, 565 F. Supp. 2d 141, 147 (D.D.C. 2008)). Where a defendant fails to contest a plaintiff's damages calculations and does not produce evidence demonstrating that a genuine dispute of material fact exists on the issue of damages, the court may find that plaintiffs are entitled to summary judgment on the issue of damages. *See Serv. Employees Int'l Union Nat'l Indus. Pension Fund v. Roseen Realty Corp.*, 308 F. Supp. 3d 132, 136–39 (D.D.C. 2018) (granting summary judgment on the

issue of damages, reasoning that defendants could not "avoid summary judgment by speculating—without evidence—that the Fund may have made a miscalculation"); *Serv. Employees Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr. Inc.*, 191 F. Supp. 3d 13, 19 (D.D.C. 2016) ("[D]efendant cannot avoid summary judgment simply by speculating that plaintiffs may have erroneously included ineligible hours without offering any evidentiary support for that contention."); *Bristol Manor*, 153 F. Supp. 3d at 375 (granting summary judgment on the issue of damages where the defendants "produced no admissible evidence contradicting Plaintiffs' spreadsheets, nor any colorable argument calling the spreadsheets' accuracy into doubt").

Here, there are no genuine disputes as to the accuracy of Plaintiffs' damages calculations. Defendants prepared versions of Plaintiffs' spreadsheets highlighting employees and contributions that they contend Plaintiffs erroneously included in their damages calculations, but they have failed to identify any alleged errors with respect to these employees other than Plaintiffs' application of the allegedly incorrect eligibility criteria addressed above. *See* ECF No. 41-1 at 3–4, 5–52; *see also* ECF No. 42 at 4–6. Defendants do not otherwise dispute the accuracy of the Fund's calculations of the amount of delinquent contributions, the amount of any overpayments the Fund has credited against those delinquencies, or the amounts of the various penalties and fees the Fund has assessed against Defendants. Accordingly, in light of Mr. Joseph's Declaration and Defendants' failure to dispute the accuracy of the Fund's calculations, the undersigned recommends finding that Plaintiffs have provided an accurate calculation of the amounts owed resulting from the audit of Defendants' 2009–2010 payroll records.

The undersigned notes that Plaintiffs' damages calculations properly include surcharges authorized by the Pension Protection Act of 2006 ("PPA"). P.L. 109-280 (2006). It is undisputed that for the plan years 2009 through 2017, the Fund was determined to be in "critical status," a

term used to identify pension funds that are undercapitalized because their liabilities significantly exceed the value of their assets. ECF No. 36-16 at 11; *see also* 29 U.S.C. § 1085(b)(2) (describing a variety of circumstances in which a multiemployer pension plan should be considered in critical status). Due to its critical status, the PPA required the Fund to implement a rehabilitation plan to remedy its financial situation. ECF No. 36-12; ECF No. 36-16 at 11; *see also* 29 U.S.C. § 1085(e)(1). Under the Fund's rehabilitation plan, participating employers are required to pay certain surcharges and supplemental contributions. ECF No. 36-16 at 12. The Fund notified participating employers, including Defendants, of the rehabilitation plan and associated required surcharges and supplemental contributions in November 2009. *Id.* Effective October 1, 2010, Defendants elected to make supplemental contributions of 10% of all contributions. *Id.* In accordance with the PPA and the Fund's rehabilitation plan, Defendants were required to pay surcharges of 5% of all contributions in 2009 and surcharges or supplemental contributions of 10% of all contributions in 2010, including those delinquent contributions at issue in this case. *Id.* at 12–13. Under the PPA, unpaid surcharges and supplemental contributions due under a rehabilitation plan "shall be treated as a delinquent contribution under section 1145 . . . and shall be enforceable as such." 29 U.S.C. § 1085(e)(7)(B). Defendants do not dispute Plaintiffs' calculations of the surcharges and supplemental contributions owed as a result of the 2009–2010 underreporting and underpayments.

Plaintiffs' damages calculations also properly include interest and liquidated damages. The Fund has adopted a Statement of Policy for Collection of Delinquent Contributions ("Collection Policy"). ECF No. 36-16 at 7; ECF No. 36-8. It provides that when an audit determines that an employer has failed to pay its required contributions the Fund is entitled to collect 10% interest

per annum, calculated from the due date of the delinquent contributions through the date the contributions are paid to the Fund. ECF No. 36-8 at 9. In the event the Fund files suit to collect the delinquent contributions, the Trust Agreement and Collection Policy also authorize the Fund to collect liquidated damages, calculated as the greater of: (a) 20% of the delinquent contributions or (b) the value of the interest due. *Id.* This mirrors the Fund's statutory remedies for delinquent contributions under ERISA. 29 U.S.C. § 1132(g)(2) (following entry of judgment in delinquent contributions case, "the court shall award the plan . . . the unpaid contributions, . . . interest on the unpaid contributions . . . [and] an amount equal to the greater of . . . interest on the unpaid contributions, or . . . liquidated damages provided for under the plan in an amount not in excess of 20 percent [of the delinquent contributions"). Defendants do not contest that the Collection Policy sets the applicable interest rate here. Nor do they contest that Plaintiffs have accurately calculated the total amount of interest or liquidated damages owed through July 21, 2018.

Plaintiffs' damages calculations also include a testing fee, reimbursing the Fund for the costs of the audit of Defendants' 2009–2010 payroll records. While the testing fee is not among the relief required by 29 U.S.C. § 1132(g)(2), it is a contractual remedy included in the Fund's Collection Policy. Specifically, that policy provides that the Fund may charge a testing fee to employers with delinquent contributions. ECF No. 36-16 at 8; ECF No. 36-8 at 8–9. Defendants do not dispute that the testing fee is a contractual remedy for delinquent contributions under the Collection Policy. While the Collection Policy does not specify the amount of the testing fee, Defendants have not disputed the validity or reasonableness of the amounts Plaintiffs charge here—$413.35 for Jackson Plaza and $944.80 for each of the other facilities (ECF No. 36-14 at 2–3)—and the undersigned does not find them unreasonable either.

Because, except for the eligibility determinations addressed above, Defendants do not dispute the accuracy of Plaintiffs' audit findings and damages calculations, the undersigned recommends finding Plaintiffs are entitled to summary judgment on the issue of damages in the amounts they claim in their motion. The undersigned therefore recommends that the Court enter judgment for Plaintiffs against each Defendant in the following amounts:

(1) $120,927.27 against Arch Plaza, Inc.;

(2) $106,832.58 against Hebrew Homes South, Inc.;

(3) $112,116.18 against Aventura Plaza, Inc.;

(4) $268.105.91 against Jackson Plaza, Inc.; and

(5) $240,218.59 against Hebrew Home Sinai, Inc.[15]

---

[15] Plaintiffs' proposed order seeks judgment entered against Hebrew Homes Health Network, Inc. for the liabilities of each of the other Defendant corporations. *See* ECF No. 36-18 at 1–3. Plaintiffs' motion for summary judgment makes no argument on this issue, except to assert that Defendants are "commonly owned and operated" and that they jointly negotiated their CBAs with Local 1199. ECF No. 36-17 at 1. The complaint likewise alleges only that Defendants "are related corporations and constitute a control group." ECF No. 28 at 6–7; *see also* 29 U.S.C. § 1002(40)(B) (explaining that "two or more trades or businesses . . . shall be deemed a single employer if such trades or businesses are within the same control group" and that "the term 'control group' means a group of trades or businesses under common control"); 26 C.F.R. § 1.414(c)-2 (defining three types of common control: parent-subsidiary, brother-sister, and combined). A plaintiff seeking to demonstrate that nominally distinct corporations are related must either show that one of the entities owns the other or else that they are co-owned by the same five or fewer individuals. *See* 26 C.F.R. § 1.414(c)-2 (defining the parent-subsidiary and brother-sister tests for common ownership); *see also I.A.M. Nat. Pension Fund v. TMR Realty Co.*, 431 F. Supp. 2d 1, 11–13 (D.D.C. 2006) (finding the plaintiff demonstrated defendants were part of a common control group where uncontradicted evidence demonstrated that the same individual owned 100% of nominally separate corporations and exercised control over them). Plaintiffs have introduced no evidence of Defendants' common ownership. The closest Plaintiffs come is a conclusory statement in an affidavit by Andre Joseph, the Fund's Payroll Review Manager, that "Hebrew Homes does business as Arch Plaza, Hebrew Homes South, Aventura Plaza, Jackson Plaza, Sinai Plaza, and South Pointe Plaza, and operates the Arch Plaza, Hebrew Homes South, Aventura Plaza, Jackson Plaza, Sinai Plaza, and South Pointe Plaza health care facilities." ECF No. 36-15 at 4. Yet Mr. Joseph's statement makes no claim about whether Hebrew Homes Health Network, Inc. owns the other facilities, or if they have a common owner or owners. Accordingly, because Plaintiffs have provided no evidence demonstrating that Hebrew Homes Health Network, Inc. should be held liable for the delinquencies of the other defendant corporations, the undersigned recommends finding this argument forfeit and entering a judgment against each Defendant separately in the amounts indicated above. *See, e.g., CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014) (argument made in conclusory fashion forfeited); *Cruz v. Kelly*, 241 F. Supp. 3d 107, 113 n.4 (D.D.C. 2018) (issue raised in opening brief without support or discussion may be deemed forfeited), *appeal docketed* No. 17-5113 (D.D.C. Cir. May 22, 2017); *Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.10 (D.D.C. 2015) (argument not made in opening brief forfeited).

The undersigned also recommends that the Court award additional pre-judgment interest that has accrued since July 21, 2018 at a rate of 10% per annum. *See* ECF No. 36-8 at 8 (setting the rate of interest for delinquent contributions at 10% per annum). Plaintiffs are also entitled to post-judgment interest pursuant to 28 U.S.C. § 1961. *See* 28 U.S.C. § 1961 (providing that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and describing the interest calculation); *see also Crabtree v. Island Breeze Marine, Inc.*, No. CV 18-1054 (CKK), 2019 WL 2569662, at *6 (D.D.C. June 21, 2019) (awarding post-judgment interest under 28 U.S.C. § 1961 to a pension fund that prevailed on a delinquent contribution claim).

### C. Attorney's Fees

Plaintiffs also seek attorney's fees for the costs of litigating this action. Where a multiemployer plan sues to recover delinquent contributions under ERISA section 515, 29 U.S.C. § 1145, and obtains a judgment in its favor, "the court *shall* award the plan . . . reasonable attorney's fees and costs of the action." 29 U.S.C. § 1132(g)(2) (emphasis added); *see also Connors v. Petitte Bros. Min. Co.*, 70 F.3d 637, at *2 (D.C. Cir. 1995) (per curiam) (explaining that "[t]he statute is clear" that attorney's fee awards are mandatory under 29 U.S.C. § 1132(g)(2)). Defendants do not contest that if Plaintiffs obtain a judgment in their favor, they are entitled to recover reasonable attorney's fees. Because the undersigned recommends granting summary judgment in Plaintiffs' favor on both liability and damages, the undersigned also recommends finding that they are entitled to recover reasonable attorney's fees.

### D. Injunctive Relief

In addition to monetary damages, Plaintiffs request injunctive relief under Section 502(g)(2)(E) of ERISA, which provides that a court may award "such other legal or equitable relief

as [it] deems appropriate." 29 U.S.C. § 1132(g)(2). Plaintiffs seek a permanent injunction requiring Defendant to remit reports and contributions going forward in accordance with the CBAs, the Fund's documents, and federal law. Defendants object to such relief, arguing that Plaintiffs have made no showing that absent an injunction they will suffer an "'irreparable harm' for which money damages cannot compensate." ECF No. 41 at 30. The undersigned agrees with Defendants.

Several courts in this district have found that injunctive relief is appropriate when "the defendant has demonstrated no willingness to comply with either its contractual or statutory obligations or to participate in the judicial process," *Carpenters Labor-Mgmt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d 237, 242 (D.D.C. 2007), or because an injunction serves to "reiterate[] what [are] already the defendant[s'] contractual obligations," *Teamsters Local 639-Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 108 (D.D.C. 2008). Nevertheless, a party seeking a permanent injunction must show the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Applying that test, Plaintiffs' request for injunctive relief fails. Even assuming they could show that the requested injunction serves the public interest and that the balance of hardships favors an equitable remedy, Plaintiffs have not demonstrated that they have suffered an irreparable injury or that monetary damages for a future violation would be an inadequate remedy. As one court in this district observed in a similar delinquent contribution case, "even substantial 'economic loss alone will rarely constitute irreparable harm.'" *Bricklayers & Trowel Trades Int'l Pension Fund v. Kel-Tech Constr., Inc.*, 319 F. Supp. 3d 330, 346 (D.D.C. 2018) (quoting *Naegele v.*

*Albers*, 843 F. Supp. 2d 123, 129 (D.D.C. 2012)). This is because "economic injuries are generally reparable with monetary damages in the ordinary course of litigation." *Naegele*, 843 F. Supp. 2d at 129. And courts should consider "the possibility that a monetary judgment might serve to alter the defendant's conduct as effectively as a permanent injunction would, rendering the latter unnecessary." *Bricklayers*, 319 F. Supp. 3d at 346 (citing *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385-86 (4th Cir. 2017)).

Here, this reasoning is especially applicable because the claims at issue arise under a statutory framework that provides for penalties and attorney's fees. *See* 29 U.S.C. § 1132(g)(2); *see also Serv. Employees Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, No. CV 12-1904 (RC), 2016 WL 3636970, at *2 (D.D.C. June 30, 2016) (observing that ERISA's attorney's fees provisions "'encourage enforcement of employer contributions' and protect funds from 'the high cost of litigation and collection expenses'" (quoting *Sheet Metal Workers Health & Welfare Tr. Fund v. Big D Serv. Co.*, 876 F.2d 852, 854 (10th Cir. 1989)). Moreover, Plaintiffs do not allege that Defendants have continued to remit inaccurate payments or reports since the inception of this litigation. *See* ECF No. 36-16 at 22–24; *cf. Bricklayers & Trowel Trades Int'l Pension Fund v. Barron*, 317 F. Supp. 3d 157, 163 (D.D.C. 2018) (granting injunctive relief where the defendant failed to make reports or payments and refused to participate in the judicial process).

Accordingly, the undersigned recommends denying Plaintiffs' request for injunctive relief.

### E.     Declaratory Relief and Defendant South Pointe Plaza

Plaintiffs also seek a declaration that Defendants violated the CBAs by underreporting and underpaying their contributions to the Fund. ECF No. 36-18 at 3; ECF No. 28 at 13. Declaratory relief is appropriate where the court finds that it "will serve a useful purpose in clarifying and

settling the legal relations in issue, and [that] it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Spriggs v. Wilson*, 467 F.2d 382, 386 (D.C. Cir. 1972) (quoting Edward M. Borchard, Declaratory Judgments 299 (2d ed. 1941)). Here, Defendants were obligated to make accurate reports and contributions to Plaintiffs, and it is undisputed that between January 1, 2009 and December 31, 2010, they failed to do so. Accordingly, in order to clarify Defendants' contractual obligations to the Fund, the undersigned recommends declaring that Defendants violated the CBAs by underreporting and underpaying their 2009–2010 contributions.

Defendants have moved for summary judgment as to Defendant South Pointe Plaza because although Plaintiffs' audit revealed the company owed the Fund for delinquent contributions in the amount of $613.30, it also revealed South Pointe Plaza had overpaid certain other contributions such that, on net, the company overpaid the Fund by $909.91. ECF No. 37-2 at 15. Defendants argue that this net overpayment means Plaintiffs' claims against South Pointe Plaza must be dismissed. *Id.* An employer's overpayments do not automatically discharge liability for delinquent contributions under ERISA, however. *See Greater St. Louis Const. Laborers Welfare Fund v. Park-Mark, Inc.*, 700 F.3d 1130, 1134 (8th Cir. 2012) (holding that an employer bears the burden of demonstrating its entitlement to restitution of overpayments before a court will apply the overpayments as a set-off for delinquent contribution liability); *Brown v. Health Care & Ret. Corp. of Am.*, 25 F.3d 90, 94 (2d Cir. 1994) (same); *S. Cent. United Food & Commercial Workers Unions v. C & G Markets, Inc.*, 836 F.2d 221, 225–26 (5th Cir. 1988) (holding that while employers are entitled to a set-off for overpayments, they remain liable to the pension fund for interest, attorney's fees, and auditor's costs). Here, Defendants do not contest the finding in Plaintiffs' audit that South Pointe Plaza underpaid its required contributions by $613.30. *See* ECF No. 37-2 at 15; ECF

No. 36-16 at 23; ECF No. 42 at 5. Accordingly, while Defendant South Pointe Plaza is entitled to an offset for its overpayments, those overpayments do not discharge its liability for its underreporting and underpayments to the Fund. The undersigned therefore recommends denying Defendants' motion as to South Pointe Plaza, although no damages should be granted Plaintiffs for South Pointe Plaza's violation of ERISA.[16]

## IV. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** Plaintiffs' cross-motion for summary judgment (ECF No. 36) and **DENY** Defendants' cross-motion for summary judgment (ECF No. 37). The undersigned further **RECOMMENDS** that the Court enter judgment for Plaintiff against each Defendant in the following amounts, to include all delinquent contributions, testing fees, liquidated damages, and interest calculated through July 21, 2018:

(1) $120,927.27 against Arch Plaza, Inc.;

(2) $106,832.58 against Hebrew Homes South, Inc.;

(3) $112,116.18 against Aventura Plaza, Inc.;

(4) $268.105.91 against Jackson Plaza, Inc.; and

(5) $240,218.59 against Hebrew Home Sinai, Inc.

The undersigned also **RECOMMENDS** the Court award Plaintiffs with additional pre-judgment interest that has accrued since July 21, 2018 at a rate of 10 percent per annum, and post-judgment

---

[16] Defendants also contend that the Court should deny Plaintiffs' claims for declaratory and injunctive relief against Defendants South Pointe Plaza and South Beach Plaza because they claim that the first facility closed in November 2013 and the second "was sold" in April 2018. ECF No. 41 at 28–29; ECF No. 37-1 at 3. Defendants have not provided adequate information about the purported closure and sale of these facilities—e.g., whether they involved bankruptcy proceedings, whether the purchaser agreed to assume the facility's liabilities, etc.—to determine what, if any, effect these transactions might have on their liability for the 2009–2010 delinquencies. Accordingly, because Defendants have failed to explain why these transactions would render a declaration as to these defendants inappropriate, the undersigned recommends entering declaratory judgment as to all Defendants.

interest at the statutory rate. *See* 28 U.S.C. § 1961. Finally, the Court should award Plaintiffs reasonable attorney's fees in an amount to be determined following an appropriate petition to the Court for the same.

\* \* \* \* \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: July 24, 2019

Digitally signed by G.
Michael Harvey
Date: 2019.07.24
12:49:06 -04'00'

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE